IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SHIMON GUY,** individually and in his Capacity as Guardian of the Estate of Meny Moore, an Incompetent Person,<br>**Plaintiff,**<br><br>v.<br><br>**BRISTOL BOROUGH, et al.,**<br>**Defendants.** | CIVIL ACTION<br><br>No. 16-1557 |

**Goldberg, J.**                                                                                              June 27, 2018

## **MEMORANDUM OPINION**

Plaintiff, individually and on behalf of the Estate of Meny Moore, brings this action against Defendant Bristol Borough ("the Borough"), alleging that the Borough was negligent in failing to inform him of any dangerous conditions on property he owned before demolishing a building on the property (Count I). Plaintiff also alleges that the Borough's failure to notify him of the demolition before it occurred constitutes a deprivation of due process (Count II).

The Borough has moved for summary judgment. I will grant the Borough's Motion as to Count I because the Borough is entitled to immunity under the Pennsylvania Political Subdivision Tort Claims Act. Because genuine issues of material fact exist as to the due process claim, I will deny the Borough's Motion as to that count.

### I.     FACTUAL AND PROCEDURAL BACKGROUND

The following facts are undisputed, unless otherwise noted.

Plaintiff, Shimon Guy, and Meny Moore purchased a property at 301-303 Radcliffe Street ("the Property") in Bristol Borough as tenants in common on October 28, 2013. This property contained a building, which had suffered extensive fire damage on October 1, 2010. On

1

December 6, 2013, Mr. Moore applied to the Borough's Historical Architectural Review Board ("HARB") for a permit to make certain alterations to the building located on the Property. On May 12, 2014, the HARB issued Mr. Moore a "Certificate of Appropriateness" to "[a]lter the structure(s) on the premises (construct third story mansard roof with open windows and no siding at this time)." On May 27, 2014 the Borough issued a permit to Mr. Moore to frame the fire-damaged third floor of the building and install a mansard roof, as recommended by the HARB. (Def.'s SOF ¶¶ 9, 5, 27, 31-32; Ex. F; Ex. C; Ex. D; Ex. K; Ex. M; Ex. N.)

On the morning of November 5, 2014, Mr. Moore was standing on the top of a bay window of the exterior wall of the building without any harness, guardrail, or other fall-protection system. While Mr. Moore was cutting floor joists on the third floor, the bay window and surrounding brick became dislodged from the wall of the building and fell to the ground, as did Mr. Moore, who tragically suffered a traumatic brain injury.[1] (Def.'s SOF ¶¶ 45-46, 48; E. Moore Dep., 41:20-24, 126:5-10; Schneyder Dep., 6:18, 7:12-13, 6:25-7:12.)

According to the Borough, neither side of the building was braced on the day of the accident, and the floor joists on the second floor were broken and sagging down from the second floor. (Def.'s SOF ¶¶ 52-53; Brown Dep. 38:7, 42:12-19; Schneyder Dep. 9:5.) Plaintiff states that Mr. Moore and Edward Moore had braced the building by removing and replacing TJI joists. He further states that he is without knowledge sufficient to respond to the Borough's allegation that the floor joists on the second floor were broken and sagging down from the second floor. Plaintiff asserts that this is because David Brown, the structural engineer who evaluated the building for the Borough and whose testimony the Borough relies upon, never entered the

---

[1] The Bucks County Court of Common Pleas Orphans' Court Division determined that Moore was incompetent, and Plaintiff was appointed as "Guardian of Meny Moore's estate to deal with [all] financial matters relating to the Property." The injuries Mr. Moore suffered are not at issue in this lawsuit. (Compl. ¶¶ 16, 25).

2

building on the day of the accident to observe its condition. (Pl.'s SOF ¶¶ 52-53; E. Moore Dep. at 45; Brown Dep. at 24.)

After learning about the accident, the Borough Manager, James Dillon, arrived at the Property sometime around 9:30 a.m., apparently before the paramedics had arrived. In viewing the accident scene, Mr. Dillon believed Mr. Moore to be the sole owner of the building and believed he was "lying dead on the sidewalk." Mr. Dillon initially asked the Borough Engineer to come to the site to review the condition of the building, however, the Borough Engineer did not have a structural engineer on staff and recommended that the Borough contact Cooke Brown, LLC. (Def.'s SOF ¶¶ 54-57; Dillon Dep. 49:21, 59:12-18, 50:13-14, 50:18-51:9.) The Borough alleges that structural engineer David Brown of Cooke Brown, LLC came to the scene sometime around 1:00 p.m. (Def.'s SOF ¶ 59; Dillon Dep. 51:7-9), however, Plaintiff points out that in his deposition, Mr. Brown could not remember if he arrived in the morning or early afternoon. (Pl.'s SOF ¶ 19; Brown Dep. at 22.)

When he arrived at the site, Mr. Brown was asked by Mr. Dillon to evaluate the structural condition of the building. Mr. Brown testified that when he first arrived, he observed the "partially collapsed building" and that the collapse originated at the top of the building where joists were being removed. He then conducted an inspection of the exterior walls of the building. Mr. Brown issued a letter dated November 6, 2014 to the Borough wherein he memorialized his observations and "recommended to the borough officials present that temporary protection be installed to protect the adjacent property, and for the building to be demolished." Mr. Brown testified at his deposition that he was concerned with the stability of the building because of "the walls being unbraced and the lack of a functional floor diaphragms for a two-story high wall." He further testified that "the condition of the second floor . . . play[ed] a significant role in [his]

3

determination that the building was unsafe. And that may have been . . . the floor joists were literally broken in the middle of them and sagging down at the second floor, [and] seeing that played a significant role in [his] judgment for determining that this building was unsafe and that those walls were unstable." Mr. Brown also testified that it would have been dangerous to try to brace the wall at that time because it would put workers in danger by placing them near the building. Mr. Brown did not physically enter the building during his inspection because in his opinion it was "unsafe to enter the building at that time," but he was able to look into the first floor of the internal structure. (Def.'s SOF ¶¶ 59-61, 68-69, 62-63, 65-67; Dillon Dep. 51:10-17; Brown Dep. 22:19-23:24, 108:19-24, 41:22-42:1, 42:12-19, 47:8-12, 24:2-7; Ex. V.)

Plaintiff contests many of the observations made by Mr. Brown, pointing out that Mr. Brown never entered the building and did not perform any tests to determine the condition of the building. (Pl.'s SOF ¶¶ 60-66; Brown Dep. at 24, 67-68.)

Mr. Dillon also asked Paul Buchhofer, President of Building Inspection Underwriters, Inc., to assess the building following the accident. (Def.'s SOF ¶ 70; Ex. W.) The Borough contends this request came immediately following the accident (Def.'s SOF ¶ 70), however, Plaintiff responds that Mr. Buchhofer assessed the building on the date of the accident "at some point" after Mr. Dillon had gone home with the flu. (Pl.'s SOF ¶ 70; Dillon Dep. at 52.) Ultimately, in an email dated November 5, 2014, Mr. Buchhofer recommended that the building be demolished. (Def.'s SOF ¶ 71; Ex. W.)

The Borough asserts that based upon the recommendations of Mr. Brown and Mr. Buchhofer, the building was demolished on the date of the accident. (Def.'s SOF ¶ 72; Dillon Dep. 56:20-57:1.) Plaintiff responds that although Mr. Dillon testified that he relied upon the recommendations or Mr. Brown and Mr. Buchhofer in deciding to demolish the building, he was

unaware of Mr. Brown and Mr. Buchhofer's conclusions until, at earliest, the day after the demolition. Plaintiff points out that Mr. Dillon had gone home with the flu, and Mr. Brown's report was dated the day after the demolition and Mr. Dillon had not heard Mr. Buchhofer's conclusions until the date of his deposition. (Pl.'s SOF ¶ 72; Dillon Dep. at 34-35, 53-57.)

The building was demolished by R&S Contractors, Inc. While in the hospital with Mr. Moore, Edward Moore was notified by a man who lived near the Property that the Borough was demolishing the building that night. Plaintiff went to view the Property on November 7, 2014. On November 11, 2014, Mr. Dillon learned of Plaintiff's partial ownership of the Property and emailed Plaintiff that, "on November 5, 2014, [the Borough] had to take immediate steps to secure the safety of the area by proceeding with demolition of the remainder of the building." (Def.'s SOF ¶¶ 76-79; Ex. Y; E. Moore Dep., 121:13-22; Guy Dep. 42:17-23; Dillon Dep. 69:3-19.)

The Borough subsequently filed a municipal claim against Plaintiff for the demolition costs pursuant to Section 109.5 of the 2003 International Property Maintenance Code ("IPMC"), which the Borough had adopted. Plaintiff paid this citation, and then on October 1, 2015, along with Mr. Moore, sold the Property for $104,395.10. (Def.'s SOF ¶¶ 81-84; Ex. X; Ex. AA; Ex. CC; Compl. ¶ 27; Answer ¶ 27.)

Plaintiff provides the following additional pertinent facts that he contends preclude summary judgment:

- Section 109.2 of the IPMC states that "whenever, in the opinion of the code official, there is imminent danger due to an unsafe condition, the code official shall order the necessary work to be done, including the boarding up of the openings, to render such structure temporarily safe whether or not the legal procedure herein described has been instituted, and shall cause such other action to be taken as the code official deems necessary to meet such emergency."

- Mr. Dillon is not sure whether he violated Section 109.2 of the IPMC on the date

5

- of the accident.

- Mr. Dillon visited and left the accident scene multiple times from morning until early afternoon when he went home sick with the flu.

- Mr. Dillon spoke with Mr. Brown and requested an evaluation when Mr. Brown arrived on the scene, and then shortly thereafter went home because he was sick with the flu.

- After Mr. Dillon had gone home, John Miller, the Borough Inspector, apparently called Mr. Buchhofer and asked him to come to the scene. Mr. Miller was on vacation that day.

- Mr. Buchhofer sent an email to Mr. Miller at 6:17 p.m. on the date of the incident recommending demolition. Mr. Miller was on vacation that day and Mr. Dillon was not copied on the email.

- Neither Mr. Dillon nor Mr. Miller was on the scene at the time Mr. Buchhofer was present.

- Mr. Dillon did not see Mr. Buchhofer's email until the date of his deposition on January 11, 2017.

- At his deposition, Mr. Dillon could not recall ever learning of Mr. Buchhofer's conclusions either verbally or in writing.

- Mr. Dillon testified that the decision to demolish the building was solely his decision, and that he based his decision on the recommendations of Mr. Brown and Mr. Buchhofer.

- At some point on the evening of November 5, 2014, "agents, servants and/or employees of the Borough, at the specific direction of Borough supervisory personnel, all acting within the course and scope of their agency and/or employment, demolished the building."

(Pl's SOF ¶¶ 100-01, 111, 116, 124, 126-33, 138; Ex. G; Dillon Dep. at 50-56, 96; Ex. H; Ex. I; Pl.'s Affid. ¶ 7.)

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" if there is a sufficient evidentiary basis on

which a reasonable fact finder could return a verdict for the non-moving party, and a factual dispute is "material" if it might affect the outcome of the case under governing law. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A).

### III. DISCUSSION

#### a. Count I – Negligence

The Borough submits that Plaintiff's negligence claim—which alleges that the Borough was negligent in not notifying him of dangerous conditions on the Property prior to demolition—is barred by the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA"). The Borough also contends there is no causal connection between the failure to notify and the alleged injury. Plaintiff responds that the Borough owed him a duty because there is an exception to the PSTCA where a property owner's identity and whereabouts are "readily accessible" to a municipality and the municipality fails to provide notice of an impending demolition.

The PSTCA bestows absolute immunity from tort liability upon the Borough unless one of eight specific exceptions applies. 42 Pa. C.S. § 8541; Kiley v. City of Phila., 645 A.2d 184, 185 (1994). The eight exceptions are for (1) vehicle liability; (2) care, custody, or control of personal property; (3) real property; (4) trees, traffic controls, and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; and (8) care, custody, or control of animals. 42 Pa. C.S. § 8542(b). "[B]ecause of the [PSTCA's] clear intent to insulate government from exposure to tort liability, the exceptions to governmental immunity are to be strictly construed." Lockwood v. City of Pittsburgh, 751 A.2d 1136, 1139 (Pa. 2000) (citing Kiley, 645 A.2d at 185-86). To satisfy one of the exceptions, a plaintiff must also establish that "[t]he damages would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person not having available a defense under section 8541 (relating to governmental immunity generally) or section 8546 (relating to defense of official immunity)." Id. § 8542(a)(1).

Plaintiff does not contend that any of the above exceptions apply. Rather, he urges that

an exception exists where a property owner's identity and whereabouts are "readily accessible" to a municipality and the municipality fails to provide notice of an impending demolition. It is under this alleged exception that Plaintiff asserts the Borough is liable for negligent demolition. Plaintiff relies primarily on a federal district court case, Swinson v. City of Philadelphia, 2016 WL 1383856 (E.D. Pa. 2016), and a Pennsylvania state case, Pivirotto v. City of Pittsburgh, 528 A.2d 125 (Pa. 1987).

In Swinson, a father and son co-owned a property that was demolished. 2016 WL 1383856, at *2. Before demolition, the father received a violation notice stating that the property had been declared "imminently dangerous," specifying the ways in which the property was in violation of Philadelphia's Property Manual Code, and instructing the father and son to comply with the notice by repairing the structure or appealing the notice. Id. The notice also warned that failure to comply with the notice could result in demolition. Id. The son never learned of the letter because he was incarcerated at the time, and the property was subsequently demolished by the City. Id. The son sued the City of Philadelphia, alleging negligent demolition, and the City argued that it was immune under the PSTCA.

The district court had concluded in a previous opinion addressing a motion to dismiss that, despite the PSTCA, the son's claim for negligent demolition was viable because the City did not provide proper notice. Id. at *6. In its opinion addressing a motion for summary judgment, the Swinson court reiterated its previous conclusion that "a common law claim for negligent demolition survives the PSTCA where § 14611 and the failure to give notice are elements of the claim." Id. at *7. In reaching this decision, the district court observed that the son's common law claim for negligence was "integrally related" to the City's notice statute, § 14611. Id. at *5. Under that statute, when the City determined that "any building or premises is

9

being maintained in a condition which is found to be hazardous, structurally unsound, dangerous or unfit for human habitation and in violation of any law or ordinance," it had to provide "a notice of such finding" and "a declaration shall be served upon the registered owner of the building or premises directing the abatement of the nuisance." Id. (quoting § 14611). This Swinson court observed that § 14611 was relevant to the same subject as the PSTCA and therefore had to be construed alongside it. Id. at *6. The district court read the PSTCA as not eliminating a cause of action against the City "when an existing state statute with constitutional ramifications requires it to serve homeowners with a notice of demolition of their property." Id. The court concluded that because the son's location was readily accessible and known to the City, and the City's failure to send him a demolition notice was unreasonable, the City was liable for damages for negligent demolition. Id. at *9.

Plaintiff next cites to Pivirotto, where the City of Pittsburgh's treasurer sold the property at issue to the plaintiff "for taxes," and a one year period of redemption was in effect after the sale. 528 A.2d at 126. There was no redemption, and the property was conveyed to the plaintiff. Id. One year prior to sale, employees of the City inspected the property and found various violations of the City's housing code. Id. Several months after the plaintiff bid on the property and paid for it, the City again inspected the property and found various code violations, resulting in the condemnation. Id. at 126-27. Notice of condemnation was sent to the record owners of the property but not to the plaintiff. Id. at 127. The record owners took no action, the City solicited bids for demolition, and demolition commenced. Id. The City maintained that a notice of condemnation was posted on the property, but the plaintiff testified he had not seen it. Id. The plaintiff sued the City for negligent demolition, arguing the City had access to the treasurer's records showing the property was sold for delinquent taxes. Id.

The Supreme Court of Pennsylvania agreed with the plaintiff. In doing so, it discussed a notice requirement contained in the second class city code as set forth in 53 P.S. § 25094. That provision provided as follows:

> All orders [respecting inspection of buildings regarding prevention of fire] herein provided or issued by the Department of Public Safety, and directed to the owner, shall be served by pasting a copy or copies in a conspicuous place on the building referred to in such order, and by prepaid mailing of a copy thereof, on the same day, to the owner or owners whose address is known or ascertained by the said department. If, after a reasonably diligent search, the address or addresses of the owner or owners cannot be ascertained, said orders shall, in addition to posting, be served upon the agent, or the tenant or tenants, or other responsible occupant of said building, if any. All orders directed to the occupant shall be served in the manner above provided, and, in addition thereto, by handing a copy thereof to the occupant of the premises.

Id. n.3 (quoting § 25094). The court concluded that the plaintiff was entitled to actual notice under § 25094 prior to demolition and the City was liable for negligent demolition because it had access to plaintiff's information and failed to notify him of the planned demolition. Id. at 129.

The exception that Plaintiff presses—that is, where a property owner's identity and whereabouts are "readily accessible" to a municipality and the municipality fails to provide notice of an impending demolition—is not delineated as one of the eight exceptions to the PSTCA. Although the Swinson court discussed and ultimately applied such an exception, Plaintiff has not provided any other case in this district that follows the same reasoning.

The claims in Pivirotto pre-dated the PSTCA and thus that opinion does not discuss governmental immunity under the PSTCA. And, the post-PSTCA cases to which Plaintiff cites do not address the PSTCA and its exceptions, but instead only damages, and thus do not shed any light on the alleged exception to which Plaintiff cites. See Oliver-Smith v. City of Philadelphia, 962 A.2d 728 (Pa. Commw. Ct. 2008); Frederick v. City of Pittsburgh, 572 A.2d 850 (Pa Commw. Ct. 1990); and Kenney v. City of Philadelphia, 21 Phila. Cty. Rprtr. 254 (Pa.

Comm. Pl. Ct. Sept. 12, 1990)).

Additionally, at least one court in this Circuit has found that a negligent demolition claim does not fall into any of the PSTCA's exceptions. See Win & Son, Inc. v. City of Philadelphia, 162 F. Supp. 3d 449, 466 (E.D. Pa. 2016) (discussed infra and holding that the PSTCA immunized the City from damages arising from demolition of a property). And, the Supreme Court of Pennsylvania has cautioned that "the exceptions to governmental immunity are to be strictly construed." See Lockwood, 751 A.2d at 1139 (citing Kiley, 645 A.2d at 185-86). I am thus hesitant to recognize the exception Plaintiff presses as it does not appear to be widely recognized.

Even if the exception discussed in Swinson exists where a property owner's identity and whereabouts are "readily accessible" to a municipality and the municipality fails to provide notice of an impending demolition, that exception is not satisfied here. Plaintiff argues that like in Swinson and Pivirotto, sections 107 and 110 of the International Property Maintenance Code ("IPMC") required the Borough to provide notice to him of the impending demolition. The pertinent part of section 107 reads as follows:

### SECTION 107
### NOTICES AND ORDERS

**107.1 Notice to person responsible.** Whenever the code official determines that there has been a violation of this code or has grounds to believe that a violation has occurred, notice shall be given in the manner prescribed in Sections 107.2 and 107.3 to the person responsible for the violation as specified in this code. Notices for condemnation procedures shall also comply with Sections 108.3.

. . . .

Section 110's relevant portions state as follows:

### SECTION 110
### DEMOLITION

12

> **110.1 General.** The code official shall order the owner of any premises upon which is located any structure, which in the code official's judgment is so old, dilapidated or has become so out of repair as to be dangerous, unsafe, unsanitary or otherwise unfit for human habitation nor occupants, and such that it is unreasonable to repair the structure, to demolish and remove such; or if such structure is capable of being made safe by repairs, to repair and make safe and sanitary or to demolish and remove at the owner's option; or where there has been a cessation of normal construction of any structure for a period of more than two years, to demolish and remove such structure.
>
> **110.2 Notices and orders.** All notices and orders shall comply with Section 107.
>
> . . . .

(Pl.'s Mot., Ex. Z.)

While sections 107 and 110 of the IPMC do appear to require notice before demolition, those provisions must be read in conjunction with section 109, which explicitly allows for the Borough to take emergency measures. That section provides as follows:

> **SECTION 109**
> **EMERGENCY MEASURES**
>
> **109.1 Imminent danger.** When, in the opinion of the code official, there is imminent danger of failure or collapse of a building or structure which endangers life, or when any structure or part of a structure has fallen and life is endangered by the occupation of the structure, or when there is actual or potential danger to the building occupants or those in the proximity of any structure because of explosives, explosive fumes or vapors or the presence of toxic fumes, gases or materials, or operation of defective or dangerous equipment, the code official is hereby authorized and empowered to order and require the occupants to vacate the premises forthwith. The code official shall cause to be posted at each entrance to such structure a notice reading as follows: "This Structure is Unsafe and Its Occupancy Has Been Prohibited by the Code Official." It shall be unlawful for any person to enter such structure except for the purpose of securing the structure, making the required repairs, removing the hazardous condition or of demolishing the same.
>
> **109.2 Temporary safeguards.** Notwithstanding other provisions of this code, whenever, in the opinion of the code official, there is imminent danger due to an unsafe condition, the code official shall order the necessary work to be done, including the boarding up of openings, to render such structure temporarily safe whether or not the legal procedure herein described has been instituted; and shall cause such other action to be taken as the code official deems necessary to meet

13

such emergency.

. . . .

Id.

Section 109.2 clearly states that "[n]otwithstanding other provisions of the code"—i.e., sections 107 and 110—when the code official concludes there is imminent danger due to an unsafe condition, the official "shall order the necessary work to be done, including . . . such other action to be taken as the code official deems necessary to meet such emergency." Notice is not required by the IPMC in an emergency situation, thus distinguishing the statute before me from those in Swinson and Pivirotto. In Swinson, the court specifically stated that "a common law claim for negligent demolition survives the PSTCA where § 14611 and the failure to give notice are elements of the claim." 2016 WL 1383856, at *7. But § 14611 is not at issue here, nor is the statute discussed in Pivirotto, and Plaintiff has failed to read sections 107 and 110 in conjunction with section 109.

I find the Win & Son court's discussion of the PSTCA more persuasive. There, the court found that the plaintiff's negligent demolition claim against the City of Philadelphia was barred by the PSTCA. 162 F. Supp. 3d at 465. The court provided three bases for its ruling. It first found that the plaintiff had failed to establish that the damages would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person without immunity, as is required by the PSTCA. Id. The court explained that the City's action identifying and reacting to a threat to public safety was "characteristic of the exercise of government power," and "[p]rivate parties do not engage in such activities, which renders the common law unavailing to Plaintiffs." Id. Additionally, the plaintiffs had not cited to any statute that prescribed duties on the part of the City. Id. Finally, the court rejected the plaintiff's

14

contention that the real estate and personal property exceptions to the PSTCA applied. Id. at 465-66. As such, the court held that the City was immunized from damages arising from the demolition of the plaintiffs' property. Id. at 466.

Like in Win & Son, the facts before me do not fit into any of the eight exceptions to the PSTCA, and the IPMC does not prescribe a duty in an emergency situation. Additionally, Plaintiff has failed to demonstrate that the damages it seeks would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person without immunity. As the Win & Son court observed, identifying and reacting to a threat to public safety is "characteristic of the exercise of government power," and "[p]rivate parties do not engage in such activities, which renders the common law unavailing to Plaintiff[]." Id. at 465.

As such, for all of the reasons above, I find that the PSTCA's immunity applies and bars Plaintiff's negligent demolition claim.[2]

### b. Count II – Procedural Due Process

The Borough avers that it did not violate Plaintiff's procedural due process rights because it based its decision to demolish the Property on "competent evidence" and provided Plaintiff with sufficient post-deprivation process. Plaintiff responds that the Borough did not have "competent evidence" to support a "reasonable belief" that an emergency existed, and therefore pre-deprivation notice was required. Plaintiff also argues that the Borough did not comply with the IPMC, there was no imminent danger to the public, and the Borough's post-deprivation procedures were inadequate. Because I conclude that Plaintiff has raised material issues of fact as to whether the Borough had "competent evidence" to support a reasonable belief that an

---

[2] My conclusion in the next section that there is a factual issue as to whether the Borough relied on "competent evidence" when it determined an emergency existed does not alter this outcome because my conclusion in this section turns on whether the facts of this case fit into an exception to the PSTCA.

15

emergency existed, I will not address Plaintiff's other arguments.

"When a plaintiff sues under 42 U.S.C. § 1983 for a state actor's failure to provide procedural due process, [the United States Court of Appeals for the Third Circuit] employ[s] the familiar two-stage analysis, inquiring (1) whether the asserted individual interests are encompassed with the fourteenth amendment's protection of 'life, liberty, or property'; and (2) whether the procedures available provided the plaintiff with 'due process of law.'" Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000) (quotations and citation omitted). With respect to the procedures afforded, "[a] fundamental requirement of due process is the opportunity to be heard . . . at a meaningful time and in a meaningful manner." Armstrong v. Manzo, 380 U.S. 545, 552 (1965). Due process is not, however, "a technical conception with a fixed content unrelated to time, place and circumstances." Matthews v. Eldridge, 424 U.S. 319, 334 (1976).

The parties do not dispute that Plaintiff's building constitutes a property interest. Rather, as was also true at the motion to dismiss stage of this case, it is the second prong of the above analysis that is at issue. Although pre-deprivation process in the form of a hearing is generally required before a state actor deprives someone of a property interest, there are certain circumstances in which pre-deprivation process is not required, as long as there is some meaningful post-deprivation process. Elsmere Park Club, L.P. v. Town of Elsmere, 542 F.3d 412, 417 (3d Cir. 2008). (citing Parratt v. Taylor, 451 U.S. 527, 539 (1981)). In this regard, pre-deprivation process is not required if there is a need for "quick action by the State." See id. (citing Parratt, 451 U.S. at 539). In other words, a pre-deprivation hearing is not required in emergency situations. Id. To establish whether there is an emergency, the Third Circuit applies a deferential standard. Id. at 418. The government must have "competent evidence supporting the reasonable belief" that an emergency exists. Id. The government, however, cannot act

arbitrarily or abuse its discretion. Id.

The Borough maintains that the recommendations of Mr. Brown and Mr. Buchhofer amount to "competent evidence" supporting the Borough's reasonable belief that an emergency existed such that the Property needed to be demolished. Plaintiff responds that it was Mr. Dillon who decided the Property should be demolished and the record is unclear on when Mr. Dillon learned of Mr. Brown and Mr. Buchhofer's recommendations.

In light of the conflicting evidence outlined in the factual background above, I agree with Plaintiff that there is a disputed issue of fact as to whether there was "competent evidence" supporting the Borough's reasonable belief that an emergency existed. The Borough has pointed to evidence in the record that calls into question whether Mr. Dillon was in possession of Mr. Brown and Mr. Buchhofer's recommendations when he decided the Property should be demolished without notice to the owners. Noticeably missing from the record is when exactly Mr. Dillon, who was home with the flu, called for the demolition of the Property, and when exactly the building was demolished. If Mr. Dillon did not receive Mr. Brown or Mr. Buchhofer's recommendations, or received them after deciding to demolish the Property, a jury could find that the Borough did not have a "reasonable belief" based on "competent evidence." Because Mr. Dillon testified that the decision to demolish the Property was solely his, this factual dispute is material. Accordingly, I will deny the Borough's Motion as to Count II.[3]

---

[3] The Borough also contends in passing that Plaintiff is estopped from bringing Count I and Count II due to alleged judicial admissions of Mr. Moore in a separate state court lawsuit filed by his wife against the architecture firm hired by Mr. Moore and Plaintiff. The Borough contends that in the state court case, Mr. Moore asserts that the building "was in an imminently dangerous condition at all times" and as such the architecture firm acted in reckless disregard when they determined the building was structurally sound. (Mot. at 12 (citing Ex. FF).) The Borough provides no authority for its proposition that Plaintiff's claims are estopped, and I therefore will not wade into this issue.

## IV. CONCLUSION

For the foregoing reasons, the Borough's Motion for Summary Judgment is granted as to Count I and denied as to Count II.

An appropriate Order follows.